UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LOUIS V. TELERICO and
TERRI ROEDER,

                Plaintiffs,

                                        Case Number 11-10702
v.                                         Honorable Thomas L. Ludington

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,

                Defendant.

_____ /

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

      This insurance case arises out of damage to a private residence. The dispositive issue is what caused the damage. Plaintiffs Louis Telerico and Terri Roeder contend that snow and ice caused the roof of the residence to sag and leak. Defendant Nationwide Mutual Insurance Company contends that the damage was caused by the residence's defective design and construction.

      The homeowners' insurance policy in question generally insures against damage to the residence, but excludes coverage for damage caused by structural defects of the residence. Seeking compensation for damage to the residence, Plaintiffs brought suit against Defendant. Defendant now moves for summary judgment. ECF No. 42. Because the undisputed evidence, including the testimony of Plaintiff's own expert witness, establishes that the damage was caused by structural defects of the residence, the Court will grant Defendant's motion.

# I

## A

In 1980, a house was built at 113 Brad Chris Drive in Houghton Lake, Michigan. *See* Ins. Policy, at Decl. 1, *attached as* Def.'s Mot. Summ. J. Ex. 2. In 1999, Ms. Roeder purchased the house for $115,000. Roeder Dep. 18:22–23, 42:21–22, Oct. 21, 2012, *attached as* Pls.' Resp. to Def.'s Mot. Summ. J. Ex. 8. Three years later, Ms. Roeder purchased a homeowners' insurance policy from Defendant. Telerico Dep. 27:15–17, *attached as* Def.'s Mot. Ex. 7.

## B

The policy in effect on the date of the alleged loss (February 28, 2004) identifies Ms. Roeder as the sole policyholder. Ins. Policy, at Decl. 1. The policy provides up to $115,800 in property damage coverage, subject to enumerated exclusions. *Id*. Specifically, the policy covers against "accidental direct physical loss . . . except for losses excluded under Section I — Property Exclusions." *Id*. at C1. Section I, in turn, provides:

> We do not cover loss to any property resulting directly or indirectly from the following if another excluded peril contributes to the loss:
>
> a) A fault, weakness, defect or inadequacy in the:
>
>   (1) specifications, planning . . .
>   (2) design, workmanship, construction, materials . . .
>   (4) development or maintenance. . . .
>
> We do not cover loss to [the residence] resulting directly from any of the following: . . .
>
> f)
>   (1) wear and tear, marring, deterioration;
>   (2) inherent vice, latent defect, mechanical breakdown . . .
>   (6) settling, cracking, shrinking, bulging or expansion of . . . roofs or ceilings.

*Id*. at D2, D3 (emphasis omitted). The policy further provides that coverage is contingent on "compliance with all the policy provisions," including proof of loss and cooperation requirements. Homeowner Ins. Policy 5. The proof of loss provides:

> In the case of loss, you must . . . submit to us, within 60 days after we request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:
>
> > (1) the time and cause of loss.
> > (2) interest of the insured and all others in the property involved and all liens on the property.
> > (3) other insurance that may cover the loss.
> > (4) changes in title or occupancy of the property during the term of the policy.
> > (5) specifications of any damaged property and detailed estimates for repair of damage.

*Id*. at E1 (emphasis omitted). Another condition requires that the insured cooperate in the insurer's investigation, providing:

> In the case of loss, you must . . . as often as we reasonably require:
>
> > (1) show us the damaged property; and
> > (2) provide records and documents we request and permit us to make copies.
> > (3) submit to examinations under oath and sign same.

*Id*. (emphasis omitted). Finally, the policy contains a limitation of actions provision, which provides in part: "No action can be brought against us unless there has been full compliance with the policy provisions." *Id*. at E3.

## C

On February 28, 2004, Plaintiffs' complaint alleges, the roof of the dwelling was damaged by "snow load and subsequent leaking." Compl. ¶ 8. In Ms. Roeder's deposition, she acknowledged that she could not recall when the dwelling was damaged, what caused the damage, or the extent of the damage:

> Q: My question is when did the problem first happen, if you know? . . .

> A: I mean, I don't recall the exact date it started leaking if that is what you are asking me. . . .
> Q: It says in the very first line on or about the 28th of February, '04 I reported a loss to our insurance company, so my question was when was it before that date that there was first any problem or is that the date the problem first occurred, if you know?
> A: I don't know if that is the date that it first occurred. I don't recall. . . . It was so long ago I just don't recall . . . . I let Mr. Telerico handle all of this. I didn't have time. I don't know anything about this stuff. . . .
> Q: So your understanding was it was the weight of the snow and ice on the roof that caused the roof to leak, is that your understanding? Maybe you have no understanding. Do you have —
> A: I just — I don't really know the details because I didn't handle this. . . .
> Q: As far as what damage it caused to the home do you know what the damages were?
> A: No, I do not recall those. . . . .
> Q: As far as the damages go, I mean — so far as what happened to the house as far as you recall was there actual water leaking into the house, do you remember that happening?
> A: I recall there being water on the walls. . . .
> Q: Other than the water on the wall we talked about any other damage that you recall from this incident?
> A: I don't recall a whole lot about — it's been so long.

Roeder Dep. 25:13–26:22, 34:11–16, 35:24–36:23.

Mr. Telerico, in contrast, makes much more concrete contentions. "Heavy levels of snow and ice accumulations," his affidavit contends, "caused severe cave in type damage and heavy water incursion from ice damming." Telerico Aff. ¶ 4, *attached as* Pls.' Resp. Ex. 12.

**D**

In March 2004, Plaintiffs sent Defendant a notice of a claim; Defendant received it on March 17, 2004. Armenio Aff. ¶ 5, *attached as* Def.'s Mot. Ex. 11. Over the next several months, the parties agree, their communications proved difficult. Def.'s Br. Supp. Mot. 3; *see* Pls.' Br. Resp. Mot. 4. The parties disagree about who caused the difficulties. Defendant alleges that Plaintiffs were at fault; Plaintiffs allege that Defendant was. *Id.*

Plaintiffs then hired a local contractor, Daughty Construction Company, to provide an estimate for repairing the residence. *See* Pls.' Summ. of Loss 1, *attached as* Pls.' Resp. 6. On May 15, 2004, the contractor provided its estimate: $58,009.82. Pls.' Resp. Ex. 3, at 3–14.

The estimate was forwarded to Defendant, which received it on July 27, 2004. Armenio Aff. ¶ 15. Defendant retained an outside adjuster, Chenard & Osborn, to investigate the loss. Armenio Aff. ¶ 19; see Adjuster's Rep., *attached as* Def.'s Mot. Ex. 4. Over the next several months, the parties agree, communications again proved difficult. Again, the parties disagree as to who was responsible for the difficulties.

### E

In December 2004, Ms. Roeder executed a quitclaim deed on the property in favor of Mr. Telerico. Roeder Dep. 30:2–7. Effective December 16, 2004, Mr. Telerico was added as a policyholder to the insurance policy issued by Defendant. Telerico Dep. 27:19–24.

### F

On January 7, 2005, Daughty Construction contacted Defendant, rescinding its estimate of the cost to repair the residence. Armenio Aff. ¶ 29. That day, Defendant sent Ms. Roeder a proof of loss form to be completed within sixty days (i.e., by March 8, 2005). Armenio Aff. ¶ 30. Defendant asserts that it did not receive Plaintiffs' proof of loss (until one was attached as an exhibit to the complaint).

When Ms. Roeder was asked in her deposition whether she had returned the proof of loss form to Defendant, Ms. Roeder testified that had no memory of doing so. *See* Roeder Dep. 40:9–44:25. Counsel asked Ms. Roeder:

> Q: Did you ever have any communications with anybody from or on behalf of [Defendant] in regard to this claim?
> A: I do not recall having any communications with them. . . .
> Q: So far as reporting the loss that would have been done by Mr. Telerico?

> A: Correct. . . .
> Q: Did you ever send anything yourself, any letters or communications to [Defendant]?
> A: I don't recall ever dealing with them. . . .
> Q: Do you recall ever filling out a proof of loss form for this loss, forms like that?
> A: No, not that I recall.

Roeder Dep. 40:9–41:7. Attached to Plaintiffs' complaint, as noted, is a proof of loss form signed by Mr. Telerico and Ms. Roeder. Compl. Ex. A. Also attached is a letter signed by Mr. Telerico and dated January 20, 2005, that provides "We are [e]nclosing our proof of loss in which you had sent on January 7th 2005." *Id*. In Mr. Telerico's deposition, he asserted that he "most definitely" mailed the letter, although he had no memory or extrinsic evidence of doing so:

> Q: Did you mail this 1-20-05 letter?
> A: Oh yes, most definitely.
> Q: Do you remember where you mailed it?
> A: I believe it would have been from down here, yes.
> Q: Down here being?
> A: Down here in the lower part of the state, Wayne County area. . . .
> Q: And when you mailed it you would have mailed it with the attachments?
> A: Yes, sir.
> Q: And do you know when you would have mailed it?
> A: Well, if it's dated for January 20th it would have gone out in that day's mail. . . .
> Q: Do you recall mailing this?
> A: No, I don't recall mailing it but I do — if I signed it and sent it in I wouldn't hesitate on mailing it.

Telerico Dep. 76:22–78:3.[1]

## G

In February 2005, Ms. Roeder was removed as a policyholder on the policy issued by Defendant. Telerico Dep. 28:10–11.

---

[1] Mr. Telerico later supplemented his deposition testimony via affidavit, asserting that he "properly put the Proof of Loss into an envelope, which was properly addressed and had a return address, and it was put in the United States mail with proper postage thereon. I correct[ly] hand delivered it to the Garden City Post Office when it was put into the mail all in the same day January 20, 2005." Telerico Aff. ¶ 7.

The proof of loss form was due on March 8, 2005. That day came. A completed proof of loss form did not, Defendant contends. Armenio Aff. ¶ 35. Defendant closed its file on Plaintiffs' claim in 2005. In June or July of 2005, the dwelling was vacated. Telerico Dep. 27:6–14. Several years passed.

### H

In January 2011, Plaintiffs brought suit against Defendant in state court. The three-count complaint asserted claims for breach of contract, unjust enrichment, and conversion. Defendant removed the case to this Court based on diversity of citizenship.

### I

Plaintiffs then proffered Jacob Glover as an expert witness on the cause of the damage to the residence. Friends with Mr. Telerico since the 1990s, Mr. Glover is a self-employed contractor who has offered his expert opinion on Plaintiffs' behalf free of charge. Glover Dep. 5:10–13, 10:3–18, Apr. 5, 2012, *attached as* Pls.' Resp. Ex. 10.

To form an opinion about the cause of the damage, Mr. Glover inspected the residence in January 2012. Glover Dep. 8:1–2. In his deposition, he testified that the rafters were spaced too far apart, the pitch of the roof was not sufficiently angled, and the cross-members lacked proper collar ties. Counsel asked Mr. Glover:

> Q: Do you know how [the damage] was caused?
> A: Not exactly but I'm pretty sure that it would be from the excess load on the — on the top of the house caused those fractures, caused it to sag in.
> Q: Do you feel there was some engineering problems with how the house was initially constructed that would cause it to fail like that?
> A: Yes.
> Q: Do you know if this happened in one event or could it have happened in numerous different events of loading of the trusses?
> A: I could not tell you that, no, I don't know.
> Q: And you can't say when it would have occurred, can you?
> A: No, I can't. . . .

> Q: Okay. So in your report here you mention certain things that were wrong with the construction that resulted in this happening, those are summarized in your report?
> A: Yes.
> Q: Can you go through and tell me what those were?
> A: Well, I feel that the rafter system is an old-style build that you see in different older homes.
> Q: Okay. Is that something wrong with —
> A: It's not as strong as a truss system today, that they use in today's methods. . . .
> Q: Any other problem that was in the construction that caused this [damage]?
> A: Spacing of the rafters, the width of the spacings next to each other.
> Q: What, too far apart?
> A: I believe to be built in a snowbelt area, might have been a little too wide.
> Q: You say these — I guess you're referring to — look in your report at page one. Halfway through the third paragraph you say these systems can be found today mostly in outbuildings and barns that still use this method of construction. Do you see that?
> A: Uh-huh.
> Q: So that method is not usually used for houses?
> A: It can.
> Q: But is it or not?
> A: It's a cheaper way to — if you can't afford trusses and you want to build something you could use them in a house, a shed or [ — ]
> Q: Do you know if it's to code or not, if code allows you to do that?
> A: Well, the new building codes don't recommend using that, no. . . .
> Q: Then you say — then you say the pitch is 4/12. Is there something wrong with that, should it be steeper?
> A: I would recommend a steeper pitch.
> Q: Do you know if 4/12 is up to code or not?
> A: A 4/12 pitch, it's still allowed.
> Q: Are you sure of that?
> A: But it depends on certain areas. It depends on certain areas. It depends on the building inspectors, if they want to have a different pitch on — that's approved on your plans or not. . . .
> Q: Would you approve this pitch for this house in this snow area?
> A: I wouldn't recommend it, no.
> Q: It's not steep enough?
> A: Yeah, right.
> Q: So therefore, it doesn't — snow wouldn't slide off or whatever?
> A: Right.

Glover Dep. 21:5–24:10. Continuing to question Mr. Glover about what he thought caused the

damage, counsel asked:

> Q: Then you say [in your report] ["]I found the main supporting roof member had endured high levels of stressing along the apparent sagging of the primary support members.["]  When you're talking about the — what do you mean by the main supporting roof members, are those those — what do you mean by that?
> A: . . . Inside there and beyond there there's support beam that all these rafters go up to.  It would be similar to that, but it's in the peak of the roof. . . .
> Q: All right.  Does it run the length of the peak?
> A: Correct.
> Q: And what is wrong with that?
> A: Where the other members, the cross members, were tied into it.
> Q: The cross members coming from the eaves up, you are talking about those?
> A: Right, they've been stressed with the load.  You can see where they've been stressed and pulled.
> Q: Once again, can you say whether that happened in one event or numerous events?
> A: I couldn't tell you how many events it took to do that.
> Q: Okay.  Then you say there's an absence of proper collar ties.  What do you mean by that?
> A: When you support those roofs you tie them together and a lot of times there are collar ties. . . .  If there's no tie then it tends to come apart.
> Q: So you are saying where the support beams hit the main beam, is that what you are talking about?
> A: Where you have supports going up to that beam, yes, you can put a collar tie on there to support that and give it a little extra strength and they were missing.  There wasn't any there.
> Q: So that was improper initial construction?
> A: Correct.

Glover Dep. 25:2–27:1.  Concluding the examination, counsel asked:

> Q: If this roof had been constructed according to code with a truss system with appropriate spacing of the rafters and an appropriate higher pitch would you agree that this damage would not have occurred?
> A: It's very unlikely it would occur with the snowfall amounts that was recorded.

Glover Dep. 30:5–10.

## J

On April 30, 2012, Defendant moved for summary judgment on Plaintiffs' complaint. Specifically, Defendant asserted that it is entitled to judgment for six reasons.  First, the policy exclusions for damage caused by design and construction defects bar any recovery on the policy

-9-

by Plaintiffs.  Second, Plaintiffs' not timely returning the proof of loss also bars recovery.  Third, Plaintiffs' conversion claim is barred by the statute of limitations.  Fourth, the conversion claim does not state a claim on which relief can be granted because it does not depend on any particular physical currency.  Fifth, the unjust enrichment claim does not state a claim on which relief can be granted because of the existence of an express contract on the same subject matter.  And sixth, Mr. Telerico does not have standing to raise claims in this case because he was not an insured under the policy when the damage allegedly occurred.

Plaintiffs' response was due on or before May 21, 2012.  That day came.  Plaintiffs did not respond.  Two months passed.  On July 30, 2012, Plaintiffs responded.

Defendants then replied raising a seventh argument regarding its entitlement to summary judgment — "Given that plaintiffs took more than four times longer than allowed by the local rule, the response should be stricken and the motion should be granted." Def.'s Reply 1.

**II**

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III

Defendant, as noted, moves for summary judgment on seven grounds. Because the exclusion from coverage argument is dispositive, it is taken up first.

### A

Insurance policies are classified under Michigan law as one type of contract. *Frankenmuth Mut. Ins. Co. v. Masters*, 595 N.W.2d 832, 837 (Mich. 1999); *see generally* Michelle Boardman, *Contra Proferentem: The Allure of Ambiguous Boilerplate*, 104 Mich. L. Rev. 1105, 1106 (2006) (discussing why "[f]ar from being the dull cousin of the contract family, insurance is the odd but brilliant prodigy").

"An insurance policy is much the same as any other contract," the Michigan Supreme Court observes, explaining: "It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Allstate Ins. Co. v. Keillor*, 537 N.W.2d 589, 591 (Mich. 1995). Thus, as a general matter "insurance policies are subject to the same contract construction principles that apply to any other species of contract." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (2005). Moreover, the court must "give the language contained within the policy its ordinary and plain meaning so that technical and strained constructions are avoided." *Royce v. Citizens Ins Co*, 557 N.W.2d 144, 147 (Mich. Ct. App. 1997) (citing *Hosking v. State Farm Mut. Auto. Ins. Co.*, 499 N.W.2d 436 (Mich. Ct. App. 1993)).

"When reviewing an exclusionary clause," like when interpreting other parts of a contract, "we read the contract as a whole to effectuate the overall intent of the parties. Where the language is clear and unambiguous, the insurance policy must be enforced as written." *Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273, 275 (Mich. Ct. App. 2004) (footnote omitted)

(citing *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 596 N.W.2d 915 (Mich. 1999); *Pac. Emp'rs Ins. Co. v. Mich. Mut. Ins. Co.*, 549 N.W.2d 872 (Mich. 1996)); *see also Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) ("We enforce contracts according to their terms, as a corollary of the parties' liberty of contracting. We examine written contractual language, and give the words their plain and ordinary meanings.").

"Coverage under a policy is lost if any exclusion within the policy applies to a particular claim." *Hayley*, 537 N.W.2d at 591. That is, Michigan rejects the "concurrent causation" theory. *Vanguard Ins. Co. v. Clarke*, 475 N.W.2d 48, 49 (Mich. 1991), *overruled in part on other grounds Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003). Specifically, Michigan rejects the theory that imposes liability on an insurer in cases involving "the convergence of two or more causes of an indivisible injury to the insured" when one of the causes falls within the coverage of the insurance policy, one falls within the exclusion from coverage. *Id.*

*Pioneer State Mutual Insurance Co. v. Splan*, No. 220477, 2003 WL 1361552 (Mich. Ct. App. Mar. 18, 2003) (unpublished op.), is instructive. There, the homeowners' insurance policy covered "direct physical loss to covered property involving [the] collapse of a building or any part of a building." *Id.* at 2. It excluded coverage for loss caused by "settling, cracking, shrinking, bulging or expansion." *Id.* After the roof developed "a severe sag," the homeowners submitted a claim asserting that the damage was caused by a "build up of ice and snow." *Id.* at 1. The insurer inspected the dwelling, concluded that the damage was caused by structural defects, and denied coverage. *Id.* Litigation ensued, with the trial court granting summary judgment to the insurer because of the policy exclusion. *Id.* Affirming the judgment of the trial court, the Michigan Court of Appeals explained that "while a 'collapse' caused by the weight of

ice or snow may be a covered loss under the policy, the unambiguous policy exclusion for latent structural defects and faulty design or construction clearly preclude coverage." *Id*. at 4. The court of appeals further noted that although the insurer had "stipulated that ice and snow was a contributing factor in the damage," for two reasons that stipulation "was of no consequence." *Id*. First, despite the stipulation, the evidence showed that "regardless whether snow fell on the house, the roof was so structurally deficient that it could not support itself." *Id*. "More importantly," the court concluded, "the courts of this state have rejected the 'concurrent causation' theory in the context of insurance liability. As a matter of law, if one cause is covered by a policy, it does not nullify another, unambiguously excluded cause in the insurance policy." *Id*. (citing *Vanguard*, 475 N.W.2d at 49).

In accord, in *Suttmann v. Wolverine Insurance. Co.*, No. 211904, 1999 WL 33326878 (Mich. Ct. App. Dec. 21, 1999) (unpublished op.), the court of appeals affirmed the trial court's judgment that the homeowners were not entitled to coverage because "the legal cause of plaintiffs' damages was latent deficiencies such as defective design, construction, and workmanship rather than the weight of ice and snow." *Id*. at 2. Noting that the expert opined that "structural deficiencies were the sole cause of the damage to their house," the court wrote:

> The only evidence plaintiffs offered to counter the engineer's opinion were statements made by [the insurance adjuster] that the winter of 1994 was severe and caused "excessive snow and ice build up" and "extreme snow loads." These comments are not sufficient to dispute the engineer's expert opinion that the structural deficiencies of the house allowed the excessive buildup of ice and snow on the house's roof and therefore do not create an issue of genuine fact regarding the cause of the damages to plaintiffs' house.

*Id*. at 5.

In this case, as noted, the insurance policy covers property damage, but excludes from coverage damage caused by structural defects. Specifically, the policy excludes coverage for

damage to the residence "resulting directly" from any "inherent vice, latent defect, . . . settling, cracking, shrinking, bulging or expansion of . . . roofs or ceilings." Ins. Policy, at D2, D3. Moreover, if one of these causes "contributes to the loss," the policy also excludes coverage for damage "resulting directly or indirectly" from a "fault, weakness, defect or inadequacy in the . . . design, workmanship, construction, [or] materials" of the residence. *Id*. at D2. Thus, the policy unambiguously excludes from coverage damage caused by structural defects in the residence.

Plaintiffs' expert, Mr. Glover, testified the damage was caused by defects in the design and construction of the residence. Specifically, he testified that the rafters were spaced too far apart, the pitch of the roof was not sufficiently angled, and the cross-members lacked proper collar ties. Glover Dep. 21:5–30:10 (quoted above).

Because the undisputed evidence of Plaintiff's own expert is that the structural deficiencies of the house caused the damage by allowing excessive buildup of snow and ice on the house's roof, the damage is excluded from coverage. Defendant is entitled to summary judgment on Plaintiffs' breach of contract claim.

Against this conclusion, Plaintiffs assert "there is no evidence of any latent defect submitted. . . . Mr. Glover's comments about other types of construction have absolutely no bearing on any latent defect. Unusual bad winter weather, a casualty, caused this damage." Pls.' Resp. 14.

Contrary to Plaintiff's assertion, Mr. Glover did not testify that the house was structurally sound and unusually heavy weather caused the excessive buildup of snow and ice on the house's roof. Rather, he testified that the structural deficiencies of the house caused the excessive buildup of snow and ice on the house's roof.

Accordingly, Defendant is entitled to summary judgment on Plaintiffs' breach of contract claim. And because Defendant had no obligation to compensate Plaintiffs for the loss, Defendant is entitled to summary judgment on Plaintiffs' unjust enrichment and conversion claims as well.

**B**

Finally, the Court notes in passing that Defendant is also entitled to summary judgment on at least one other ground. Specifically, Plaintiffs have not established that the proof of loss was timely received by Defendant. And timely receipt of the proof of loss by Defendant, as noted, is a condition precedent to a right to recover under the policy. Ins. Policy, at E1 (quoted above).

For the presumption of receipt to arise from mailing, the Sixth Circuit instructs, a plaintiff must produce evidence that the letter was "properly addressed, had sufficient postage, and was deposited in the mail." *Laird v. Norton Healthcare, Inc.*, 442 F. App'x 194, 199 (6th Cir. 2011) (quoting *In Re Yoder Co.*, 758 F.2d 1114, 1118 (6th Cir. 1985)).

Here, Ms. Roeder testified that she had no memory of sending the proof of loss to Defendant. Roeder Dep. 40:9–41:7. Mr. Telerico likewise acknowledged he had no memory of doing so. Telerico Dep. 76:22–78:5. "Do you recall mailing [the proof of loss letter to Defendant]?" he was asked in his deposition, responding: "No, I don't recall mailing it but I do — if I signed it and sent it in I wouldn't hesitate on mailing it." Telerico Dep. 78:3–5.

Setting to one side the implicit circularity of the gentleman's contingent conclusion ("if I . . . sent it in I wouldn't hesitate on mailing it"), by his own acknowledgment he has no memory of mailing the letter, much less properly addressing it or ensuring that it had sufficient postage. Drawing all reasonable factual inferences in Plaintiffs favor, no presumption of receipt can be

inferred because both Ms. Roeder and Mr. Telerico have testified that they have no memory of sending the proof of loss to Defendant.

Mr. Telerico's affidavit supplementing his deposition testimony does not alter this conclusion. In that document, he asserts that he "properly put the Proof of Loss into an envelope, which was properly addressed and had a return address, and it was put in the United States mail with proper postage thereon. I correct[ly] hand delivered it to the Garden City Post Office when it was put into the mail all in the same day January 20, 2005." Telerico Aff. ¶ 7. The Sixth Circuit, however, instructs:

> A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [the party's] earlier deposition testimony. . . . If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.

*Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

Yet in Mr. Telerico's deposition, as noted, he testified "I don't recall mailing it." Telerico Dep. 78:3. In his affidavit, in contrast, he asserts that not only does he recall mailing it, he recalls properly addressing the envelope, including a return address, placing proper postage on the envelope, and hand delivering it to a specific post office on a specific day. Although it is possible that Mr. Telerico's memory improved after his deposition, the Court is obligated to follow the Sixth Circuit's instruction that a factual issue is not created "by filing an affidavit, after a motion for summary judgment has been made, which contradicts [the party's] earlier deposition testimony." *Reid*, 790 F.2d at 460.

Plaintiffs have not demonstrated that they properly mailed the proof of loss. Consequently, no presumption of receipt arises. Defendant is entitled to summary judgment on this ground as well.

**IV**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment (ECF No. 42) is **GRANTED**.

It is further **ORDERED** that Defendant's motion to dismiss (ECF No. 38) is **DENIED AS MOOT**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 22, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 22, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS
